THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* DANIEL McGEOGHEGAN *et al.* Plaintiffs in Error.

*Opinion filed April 20, 1927.*

1. CRIMINAL LAW—*testimony of an accomplice should be acted upon with caution.* Testimony of an accomplice is liable to grave suspicion and should be acted on with the utmost caution, and a conviction resting upon such testimony will not be affirmed unless the record is substantially free from prejudicial error.

2. SAME—*the record must be free from error where evidence is conflicting and that for the defendant tends to establish a defense.* Where the evidence introduced for the defendant tends to establish a defense and the evidence in the record is highly conflicting, a conviction will not be sustained unless the record is substantially free from prejudicial error.

3. SAME—*conviction must be reversed where conduct of court and prosecuting attorney deprives defendant of fair trial.* It is the duty of the court, as well as that of the prosecuting attorney, to see to it that every defendant has a fair and impartial trial, and where they have not done so and prejudicial error is willfully committed and willfully allowed, a judgment of conviction must be reversed.

4. SAME—*court should not make investigation outside record in deciding on motion for a new trial.* In determining a motion for a new trial the court should not make an outside investigation through a specially appointed bailiff to ascertain the credibility of certain alibi witnesses at their place of residence in another State nor should the result of such investigation be considered but the motion for a new trial should be decided solely on its merits after considering the reasons assigned for granting it.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. WILLIAM N. GEMMILL, Judge, presiding.

PATRICK H. O'DONNELL, (JOSEPH ROACH, of counsel,) for plaintiffs in error McGeoghegan and Flannery; EVERETT JENNINGS, for plaintiff in error Fernekes.

OSCAR E. CARLSTROM, Attorney General, ROBERT E. CROWE, State's Attorney, and MERRILL F. WEHMHOFF, (HENRY T. CHACE, JR., and EDWARD E. WILSON, of counsel,) for the People.

Mr. JUSTICE DUNCAN delivered the opinion of the court:

Plaintiffs in error, Daniel McGeoghegan, John T. Flannery and Henry J. Fernekes, were indicted with Bruno Purell, in the criminal court of Cook county, for the murder of Michael Swiontkowski. On motion a severance was granted to Purell. The other three defendants pleaded not guilty, and on the trial the jury found them guilty and fixed their punishment at death. Motions for a new trial and in arrest of judgment were overruled and the defendants were sentenced to be hanged. A writ of error has been granted.

The undisputed facts in this record are in substance as follows: On the morning of March 19, 1925, between nine and ten o'clock, three officers of the Pulaski Building and Loan Association, located at the northeast corner of Morgan and Thirty-second streets, in the city of Chicago, left the offices of the association and entered a Willys-Knight sedan automobile. The three officers were John F. Jasinski, secretary, Michael Swiontkowski, vice-president, and Frank J. Palt, attorney. They had wrapped in a newspaper $11,950 in currency and some checks, property of the building and loan association, which they were taking to a bank for deposit. Jasinski drove the car and had the package of money and checks near him on the floor of the automobile. Swiontkowski and Palt were each armed with a revolver and occupied the rear seat of the car, the former on the left and the latter on the right. They drove west on Thirty-second to Mospratt street, the next street west of Morgan street, and then proceeded south on Mospratt street. They

had only gone a short distance south when their progress
was arrested by a Hudson coach automobile, which moved
slowly from the east curb line across Mospratt street. When
Jasinski attempted to pass the Hudson car on the left that
car backed up, and about the same time a touring car came
from behind Jasinski's car on his right and forced him to
drive into the east curb of the street and stop. Two men
occupied the Hudson car and two were in the touring car.
While the cars were all stopped a man jumped from the
running-board of the Hudson car with a revolver in his
hand, ran to the left side of Jasinski's car, opened the door
and exclaimed, "Stick them up! Give us your money!"
Swiontkowski reached for his pocket and was immediately
shot by the man at the door. About the same time the two
men ran from the touring car to the right side of Jasinski's
car and one of them broke the glass on the rear right side
of Jasinski's car, pointed a pistol at Palt and demanded that
he open the door and give up his revolver, and Palt obeyed
him. This man then ordered Jasinski to shut off his motor
and give him his gun. He also took the keys to Jasinski's
car, grabbed the package of money and checks and ran to
the touring car, saying as he ran, "Come on, boys! I have
the money!" The man who shot Swiontkowski ran to the
Hudson car, and then the two cars containing the robbers
drove south on Mospratt street. Swiontkowski was shot in
the left pectoral region, the ball, a 38-calibre lead bullet,
perforating the lungs and descending aorta and lodging in
the left pleural cavity. He died within a very short time.

The defense of all the defendants was an alibi. No two
of them claimed to be at the same place on the day of the
alleged crime. The evidence for and against Fernekes is
so different from that offered for and against the other de-
fendants as to require a separate statement and considera-
tion of it. He employed his own counsel to look after his
defense, only. Neither of the other two defendants, ac-
cording to their testimony, ever knew or saw Fernekes

before the trial of this case. The testimony of the chief witness, and about the only witness against the other two defendants, has no tendency to connect Fernekes with the robbery and killing of Swiontkowski.

The defendant Fernekes was at the trial identified by John F. Jasinski, Frank J. Palt and William C. Thurn, a real estate dealer in Chicago, as one of the two robbers who left the touring car at the right of Jasinski's car and who broke the glass on the right side of that car, pointed his revolver at Palt and Jasinski and demanded their guns and took the package of money and checks. None of these three witnesses had ever seen Fernekes before the day of the robbery. The robbery, according to their evidence, was accomplished in from one to three minutes. The first time they saw him after the robbery was about the last of April or the first of May, 1925, at the Fillmore street police station, where they were called by the police for the purpose of determining whether or not they could identify him as one of the robbers. Before going to the police station for that purpose Jasinski called Palt on the telephone and told him to look at the picture of a man on page 14 of that day's issue of the *Evening American,* who he thought was one of the robbers. The printed picture was that of Fernekes. Every one of these witnesses stated, over the objections of Fernekes, that he had made frequent visits to the police station and elsewhere for the purpose of looking at suspects and had looked at more than one hundred persons and had failed to identify any one of them as one of the robbers in question, except Fernekes. Jasinski testified that the man he identified as Fernekes had on a dark-brown coat and a light Fedora hat at the time of the robbery, and Thurn testified that he had on a tan overcoat and a gray hat. Palt did not describe his clothing. They saw Fernekes alone at the police station when they identified him.

Thurn testified that he was driving in his car in the vicinity of Thirty-second street and 3300 Mospratt street and

"saw a touring car pull to the east side. I saw a man come back from the rear end of the car with a package in his hand and get into the front part of another touring car, and the package was wrapped up in a newspaper. I see the man in the court room. As far as I could see, the touring car into which this man got went south." It does not appear from the evidence how far this witness was from the man he said was Fernekes and who had the package in his hand and went with it to the robbers' touring car, but he must have been some distance south of all three cars, as he states that the man whom he identified as Fernekes was sitting on the right side of the touring car when it passed witness. He further stated that the shooting was over when he arrived at the scene of it and that Swiontkowski was sitting on the rear seat of Jasinski's car.

The printed picture of Fernekes that the three witnesses saw in the newspaper was accompanied by a sensational article with this headline: "Fernekes Lured to Crime Life by Love." The first sentence of this article is in these words: "Paradoxically, it was love, tenderest of all the human emotions, that started Henry J. Fernekes, at the age of eighteen, on a coldly calculated career of crime that led him through four murders, unnumbered street corner hold-ups and fourteen bank robberies, to a cell in the detective bureau." Then follow a purported history of the life, courtship and marriage of Fernekes with Lulu Woodward, and a letter to her informing her in advance that he was intending for her sake and comfort to go on one of his supposedly dangerous hold-ups or robberies to obtain means for her support. He is then described in a very vivid and sensational manner as an associate of safe-blowers, bank robbers and all-round criminals, and as one who had participated in many bank robberies and noted hold-ups and murders committed in various parts of the country and for which crimes he was being hunted.

Two police officers testified that they arrested Fernekes in the afternoon of April 18, 1925, on the fourteenth floor of the John Crerar Library, in Chicago, and identified a 45-calibre automatic pistol and a 45-calibre revolver, together with the holsters in which Fernekes was carrying them at the time of his arrest, and a number of cartridges and clips found on his person, all of which were introduced in evidence over his objection.

Fernekes' defense was an alibi; that on March 18, 1925, he was in the State of Indiana, near Valparaiso, and on the day of the crime alleged was not in Chicago and had nothing to do with the commission of it and knew nothing about it. He was supported in this defense by four witnesses living near Valparaiso, three of whom testified very positively that he was near Valparaiso on March 18, 19 and 20, 1925, and stayed the first two of those days and nights at the home of Mr. and Mrs. Bert Woodward, the father and mother of Lulu Burge, the former wife of Fernekes. They had all known Fernekes for many years and three of them gave plausible reasons which enabled them to fix definitely the dates when they testified Fernekes was in Indiana at the places stated by them. Woodward testified in corroboration of the other three witnesses that he remembered that Fernekes was at his home three days about those dates but could not state the exact days. Gertrude Day stated the following facts as the means of her being able to fix those dates definitely: She kept house for her sister and brother-in-law, who were in Maine, in March, 1925. She cared for about 300 canary birds for her sister. She had known Fernekes since he was a boy. He was at her sister's home on the above dates and inquired for her sister, whom she expected home at any time. He came there on the morning of March 19, 1925, with Lulu Burge. The witness had a calendar on which she noted events and things she wanted to remember and tell her sister when she came home, such

as the days when the eggs were set, the days they were hatched, the days people were there, etc. She wrote on the calendar across the dates March 18, 19, 20, 1925, the words, "Henry Fernekes was here." This calendar was introduced in evidence.

Lulu Burge testified that on March 18, 1925, Fernekes came to her home and asked her to go for a ride with him the next morning. At nine o'clock on the morning of March 19 she met Fernekes at the Baptist church in Valparaiso and rode with him to Gertrude Day's home (the witness who marked the calendar.) They then drove to Fernekes' father's farm, about five miles from Valparaiso. They purchased groceries and went there to prepare their lunch. While there Fernekes carved her name and his name on a birch tree. She took a photograph of the carving, which was introduced in evidence. The carving was: "H. J. Fernekes and Lula B. Mar. 19, 1925." In the afternoon of that day they drove to Michigan City and LaPorte and back to Valparaiso, arriving there about 5:30 in the afternoon.

Fernekes did not testify. Pending the motion for a new trial the trial judge sent Edward A. Evans, a bailiff, to Valparaiso to investigate the credibility of the alibi witnesses for Fernekes. Evans made a full investigation of the matters entrusted to him and reported to the court to the effect that the witnesses were in good standing where they lived and bore good reputations for veracity. He also reported that he had found other credible persons who stated to him that they had seen Fernekes in Valparaiso on the day of the murder and robbery. He examined the tree on which the names of Fernekes and Lulu Burge were carved, and the date, "Mar. 19, 1925." He stated that the carving was there as testified by Lulu Burge, and that all of the carving appeared to have been made at the same time. In explanation of his action in having the investigation made, the court stated that a rumor had come to him on several occasions

to the effect that the head of the detective bureau in Chicago had several times stated that in his judgment Fernekes was not at the scene of the murder and robbery and that he could not connect Fernekes with the other two defendants. On the argument of the motion for a new trial the court had the chief of detectives sworn and examined him with reference to these rumors. The witness answered the court to the effect that there were people working with him who said, in substance, that Fernekes was getting a "bum rap" in this case, but that he did not say it and could not remember that he had ever discussed the question. The motion for a new trial was supported by the affidavits of two other witnesses from Valparaiso that they had seen Fernekes there on March 19, 1925, and also by an affidavit of Fernekes showing the contents of the newspaper article appearing in the *Evening American* on April 22, 1925.

None of the eye-witnesses to the murder and robbery were able to identify either the defendant McGeoghegan or Flannery as a party to the robbery. Practically the only evidence against them was the testimony of Bruno Purell, who was jointly indicted with them but was granted a severance by the court and testified for the State in substance as follows: He had known Flannery for two years and McGeoghegan for about ten years. In 1924 McGeoghegan saw people making deposits at the office of the building and loan association and asked Purell what kind of an institution it was. Purell told him all about it, and then he asked Purell on what days the association took its money to the bank, and was told that it was on Thursdays. McGeoghegan then said it would be a good place for a hold-up. On March 17, 1925, Purell had a conversation with these two defendants, in which they told him they were going to make the hold-up on Thursday and for him to keep his mouth shut. On that day, March 19, 1925, between nine and ten o'clock, Purell was standing in front of a drug store on the corner of Thirty-second and Morgan

streets and saw McGeoghegan, and another man he did not know, driving west on Thirty-second street in a touring car. About five minutes later Flannery, in a Hudson coach, drove by on the same street and in the same direction. Later he saw McGeoghegan come back in the same touring car and stop in the middle of the block between Morgan and Mospratt streets, with the front of the car to the west. Purell then went into the drug store and a few minutes before ten o'clock heard "a lot of commotion" and went over to Swiontkowski's house, where a lot of people were gathered. At midnight of that day, in response to a telephone call, he met Flannery and McGeoghegan at a house occupied by McGeoghegan and a Mrs. Walsh. The two defendants there gave him $500 and told him to keep his mouth shut. They also told him they got $12,000 in cash and $1800 in checks in the robbery. Purell then went to a room in the Wilton Hotel occupied by a Mrs. Snyder, where he counted the money given to him in her presence. On March 20, 1925, he deposited $300 of the money in the Fidelity Bank. On that night at the home of McGeoghegan he met the two defendants, and Mrs. Walsh, Mr. and Mrs. Rix, Mrs. Snyder and Mrs. Branscomb were also there. While there Flannery told him about holding up Jasinski's car and how it was accomplished. He also told him that Swiontkowski was shot by Flannery because he did not obey the order to stick up his hands. Flannery told him it was none of his business who the other two men were who took part in the robbery. About April 22, 1925, Flannery showed him the newspaper article aforesaid and said that if they railroaded Fernekes it would save his hide. Witness identified a picture of Fernekes' car introduced in evidence, as the car he had seen in front of Swiontkowski's house after the robbery. He further testified that he had never seen Fernekes before the trial and had never seen him in company with the other two defendants. He did not see him in the neighborhood of Thirty-second and

Mospratt streets the morning of the murder and robbery. The witness also stated that he had lived at several places in Chicago since the robbery and at two places with Mrs. Snyder, and that he was known as Bert Matthews and Mrs. Snyder was known as Mrs. Bert Matthews. When the witness was arrested he was working on a lake steamer under the name of P. J. Quinn.

Apparently for the purpose of corroborating Purell's evidence in some particulars, Mrs. Snyder testified that she was employed on the same lake steamer as was Purell when he was arrested; that she knew Purell, Flannery and Mc-Geoghegan but had never seen Fernekes before the trial; that Purell came to her apartment between four and five o'clock on the morning of March 20, 1925, and had $500, which he counted in her presence, and that she was at the home of McGeoghegan on the night of the same day and saw Flannery there.

Stanley Strazak testified that he was with Purell for about an hour and a half on the corner of Thirty-second and Morgan streets, in front of a drug store, on the morning of the murder and robbery. He knew McGeoghegan and went to his house with Purell on the night of March 20, 1925, and that Flannery, Mrs. Snyder and Mr. and Mrs. Branscomb were there. He did not know Fernekes and did not see him in the vicinity of Thirty-second and Morgan streets on the morning of the robbery. Witness was arrested or taken to the police station about the middle of June, 1925, and was told by the police that Purell had informed them he was with witness at the drug store on the morning of the robbery.

The manager of the Fidelity Trust and Savings Bank identified a deposit slip, savings pass-book and ledger sheet of that bank showing a deposit of $300 on March 20, 1925, in the name of B. J. Snyder. He testified that the employee who opened that account was not then connected with the bank but thought he was still in Chicago. There was no

showing that Purell made that deposit or that he was known as B. J. Snyder. The foregoing evidence and exhibits were introduced over the objection of the defendants.

Flannery and McGeoghegan testified in their own behalf and each of them denied having any knowledge or connection in any way with the robbery or the killing of Swiontkowski. They denied *in toto* the truth of the testimony of Purell that they were in the vicinity of Thirty-second and Morgan streets on the morning of the robbery or that they passed that corner that morning in automobiles or otherwise. They also denied the truth of Purell's testimony that they at any time or place talked to him about the robbery and murder, or that they gave him the sum of $500, or any other sum, of the loot.

McGeoghegan also testified that on the morning of March 19, 1925, he went to the office of Dr. Hanson for dental work in pusuance of an appointment and arrived at the office about nine o'clock, waited about fifteen minutes while another patient was being treated, and then had a wisdom tooth extracted. He then went to the place he was staying, at Sixty-sixth and Seely streets, and remained there the remainder of that day. He admitted that he knew Purell and Mrs. Snyder, but denied having had any conversation with Purell about the murder of Swiontkowski or about the robbery. Dr. Hanson, the dentist, corroborated McGeoghegan as to the fact that McGeoghegan had an appointment with him for dental work on the morning of the robbery and testified that he had known him for a year and a half. He had his appointment book with him and testified that it showed such appointment between the hours of nine and ten o'clock that morning and that to the best of his knowledge McGeoghegan kept the appointment, although he had no recollection of the matter independent of his appointment book.

Marie Walsh testified that both McGeoghegan and Flannery roomed at her house, at 6639 Seely street. She

met Purell and Martha Snyder, whom she knew as Mr. and Mrs. Matthews, about the first week in February, 1925, and saw them at a valentine party about the second week in February, 1925, but did not see either of them again until after Easter. She positively stated that Purell did not come to her house in March, 1925, and have a talk with the two defendants.

The defendant Flannery testified that he knew McGeoghegan but had never seen Fernekes until he came into court for this trial. He knew Purell and met him at the home of Mrs. Walsh early in February, 1925, and did not again see him until in April, 1925. He also testified that he was in the restaurant business at 1525 Wabash avenue, in Chicago, from January to May 1, 1925. He went to the home of Mr. and Mrs. Arthur Rix on the evening of March 18, 1925. He was intoxicated at that time and slept there all that night and until between eleven and twelve o'clock the next day, which was the day of the robbery. Mr. and Mrs. Arthur Rix and Albert S. Walsh, the last named being an electrical engineer who roomed at the Rix house, all corroborated Flannery. They testified that Flannery came to the Rix home about 9:30 in the evening of March 18, 1925, in an intoxicated condition and slept there that night, and did not leave his bed until about eleven o'clock the next morning. Flannery and Mr. and Mrs. Rix were very good friends, and Flannery frequently went to their home. Mrs. Rix fixed the time Flannery was at her house by the birth of her sister-in-law's child. Walsh was sick and was unable to go to work on March 19, 1925.

In view of our decision in this case we should not discuss the merits of it on the evidence and it is not our intention to do so. It will be necessary to state some of the leading facts so as to understand some of the reasons for our rulings.

The evidence in the record makes it clear that just four men participated in the robbery. Two of those men were

in the Hudson coach when Jasinski's car was forced to the east curb of Mospratt street. The other two robbers were in a touring car. If Purell's testimony be accepted as true, two men were in the robbers' touring car when it passed the corner of Thirty-second and Morgan streets, going west, just before Jasinski's car left that corner on its way to the bank,—McGeoghegan and a man unknown to Purell. Only one man was in the Hudson coach when it was driven west on Thirty-second street just before the robbery, and that man was Flannery. Strazak was with Purell on that corner about an hour and a half before the robbery took place. According to his evidence he was, with Purell all the time they were there that morning. Nothing happened there, he says, to attract his attention until they brought Swiontkowski home. He then left the drug store with Purell but did not state where they went.

The testimony of Mrs. Snyder to the effect that Purell had $500 in money and counted it in her presence about four or five o'clock in the morning of March 20, and the testimony of the banker that a deposit of $300 in money was made with the Fidelity Bank on the same day, was all incompetent, for the reason that it did not prove or tend to prove the charge against any of the defendants. It is not necessary, therefore, to further consider it.

The conviction of the defendants Flannery and Mc-Geoghegan rests upon the uncorroborated testimony of Purell. According to his own evidence he told them all about the building and loan association and when it made its deposits. He stated that he was informed by them in advance of the intended robbery. He lurked in the immediate vicinity of the building and loan association just before and at the time the officers left their office with the funds and later received $500 of the money obtained in the robbery. He is a confessed accomplice in the crime committed. These two defendants are corroborated by competent evidence, which, if true, shows that they were

not at the scene of the commission of the crime and did not participate in it.

The identification of Fernekes by two eye-witnesses to the crime, and by Thurn, who was driving in the vicinity, was made after they had all seen the picture of Fernekes in the paper and had read the sensational article accompanying it. They were asked to identify Fernekes, if they could, as a participant in the crime charged. They, of course, had Fernekes' picture strongly impressed on their minds when they went to the police station to see him. He was alone when they saw him. They readily saw that the picture in the paper was his picture, and they were convinced, undoubtedly by the newspaper article, that he was a man capable of any character of crime. The fact that these three men had previously been shown more than one hundred suspects and had identified none of them as a participant in this crime has no significance in the identification of Fernekes. They examined no other suspects under circumstances similar to those under which they examined Fernekes. It cannot be said that the identification of Fernekes can be accepted without some doubt being had that it was a mistaken one, in view of the other evidence in the case. Counting the two witnesses whom the investigator discovered in Indiana, there are six witnesses who have positively sworn that Fernekes was in Indiana on the day the crime was committed. Purell is a strong witness for the State, if his evidence is believable, to the effect that Fernekes was not one of the four men who committed the robbery.

This court has sustained convictions on the uncorroborated testimony of an accomplice, but it has always held that such testimony is liable to grave suspicion and should be acted on with the utmost caution, and that a conviction resting upon such testimony will not be confirmed unless the record is substantially free from prejudicial error. This court has frequently said in other cases that where there is

a defense proved by the testimony introduced for the defendant and the evidence in the record is highly conflicting, a conviction will not be sustained unless the record is substantially free from prejudicial error. *People* v. *Johnson,* 314 Ill. 486; *People* v. *Crane,* 302 id. 217.

Complaint is made that the assistant State's attorney was frequently guilty of improper conduct during the course of the trial that was very prejudicial to the defendants. That contention is well supported by the record. The prosecutor's conduct was very unfair and unethical and deserved severe condemnation by the trial court. We here point out several instances of such conduct but not all of those that appear in the record.

When counsel for Fernekes was cross-examining the witness Jasinski he questioned him about talking with Palt, and his answer was that he had talked with Palt every day since the murder. One of defendants' counsel said, "Sure." On objection made by the prosecutor, defendants' counsel immediately asked that this expression be withdrawn from the record. Thereupon the prosecuting attorney said, "There is nothing sure about this defense." During the cross-examination of the State's witness Purell he was asked if he made a statement to the police officers, and his answer was that he did. On re-direct examination he was asked by the prosecutor if this statement was in writing, and he replied that it was. The prosecutor then produced the paper containing that statement and asked that it be marked as an exhibit. Defendants' counsel objected that the statement was incompetent, whereupon the prosecutor said: "Counsel has brought it out and made quite a hullabaloo about the statement; I am willing to put it in now; if he doesn't want it, all right." Defendants' counsel objected because the statement made to the police was inadmissible, but the court ruled that it might be marked as an exhibit and ignored the motion that the jury be instructed to disregard the offering of the document. After

further examination the paper was offered in evidence, and
when the court asked what it was, the prosecutor said,
"This, your honor, is the statement that counsel wants."
On direct examination of defendants' witness Walsh there
was some hesitancy about answering questions. Counsel
for defendants asked the witness if the questions bothered
him, whereupon the prosecuting attorney said, "Maybe his
conscience is bothering him." On cross-examination of de-
fendants' witness Gertrude Day she stated that she cared
for a number of canary birds. The prosecutor at once in-
terjected the query, "Canary or jail?" On the cross-exami-
nation of Arthur Rix the prosecutor told the witness to
look at Cashen, one of defendants' counsel. He replied:
"I have looked at you continually; I am not looking around
the room." The prosecutor sneeringly replied, "Sir?" The
witness answered, "I am answering your questions." The
prosecutor replied, "You are answering my questions like
you did before—giving me an answer whether you know
or not," and then, after waiting for a rejoinder by the wit-
ness but who did not reply, he again sneeringly said, "Sir?"
The witness then replied, "I haven't said a word." The
prosecutor replied: "Quite right; you haven't said anything
as yet; you have done a lot of talking, though; now, what
do you mean, Mr. Witness, when you said, 'Is there any
objection?'" The court sustained objections to the im-
proper and impudent questions to the witnesses in every
instance and to many others of like character in the record
and to the prosecutor's improper remarks, but at no time
did the court in any way undertake to stop or prevent such
misconduct on the part of the prosecutor. The attorneys
on both sides were in a continual wrangle with each other
because of the misconduct of the prosecutor, and as a natu-
ral consequence they were very antagonistic to each other
throughout the trial. In his argument to the jury the prose-
cutor was displaying the large pistols taken from Fernekes
at the time of his arrest. The attorney for Fernekes asked

the prosecutor not to point those weapons toward him while he was handling them.  The prosecutor at once replied that he was pointing them in the direction where the least harm would be done if they were discharged.  The prosecutor in his argument to the jury denounced the attorney for Fernekes as a low, degraded man, who had "sunk down, down and down into the depths of degradation and had prostituted himself for gangland's smile and gangland's gold."  Continuing his argument he referred to the counsel for the defendants as men mentally depraved and mentally diseased.  In his argument to the jury he gave as a reason for demanding the death penalty that if the defendants were not to hang, the position of the witnesses who testified against them would be hazardous, and that the safety and protection of those witnesses could be secured only by the hanging of the defendants.  In his argument to the jury, while not directly referring to the fact that Fernekes did not testify as a witness, he so shaped his argument as to remind the jury definitely and certainly of the fact that Fernekes had not testified.

Proper objections were made by the defendants' counsel to all of the above matters, and the court generally, when he ruled at all, sustained the objections, but he took due care not to discourage the prosecutor in the continuation of that conduct by making it known to him that he must not persist in it.  In fact, the court's conduct was such as to induce the belief that he approved the prosecutor's conduct although he ruled that it was improper, and the proof is in the record that this is so.  The court, in referring to the improper conduct toward Fernekes' witnesses and his counsel, on the motion for a new trial said to the prosecutor:  "You aroused my very highest regard for the way in which you tried this case.  You tried it well, although your judgment was probably better than mine in the matter of examination.  I wouldn't have done it that way.  Probably others wouldn't have done it, but you ac-

complished what you set out to do, and that was to convict this man. As I say, this cross-examination of these two or three witnesses wasn't the way I would have done it, and there is no criticism."

The misconduct of the State's attorney could serve no other purpose than to inflame and prejudice the jury against the defendants' attorneys as well as against the defendants. In *People* v. *Black,* 317 Ill. 603, this court said: "The State's attorney should not allow consideration for any sensitiveness of feeling of defendants' counsel or a desire to refrain from doing or saying anything objectionable toward them to interfere with the proper and forceful presentation of the case to the jury, but the conduct of a trial in a court of justice should be characterized by a degree of dignity and good order." It is further stated in that case: "If the evidence of guilt is such that the State's attorney believes a conviction is warranted, it is his duty to try to secure a verdict of guilty, but it is never his duty to resort to unfair and improper methods to secure a conviction;" and that the same fair and impartial trial is guaranteed by law to all defendants, whether they be good or bad, guilty or innocent. To the same effect is the holding in *People* v. *Saylor,* 319 Ill. 205, *People* v. *Bimbo,* 314 id. 449, and *People* v. *Kawoleski,* 313 id. 257.

The court erred in giving to the jury People's instruction No. 45. It is an instruction to the jury with reference to the credibility of the alibi witnesses, and it set forth what they should consider in passing upon the credibility of such witnesses and the weight of their testimony. This same instruction was criticised and held erroneous in the case of *People* v. *Krauser,* 315 Ill. 485.

An instruction was also given to the jury on circumstantial evidence. There is no circumstantial evidence against any of the defendants in this record that warranted the giving of that instruction. The evidence of the State as to Fernekes was based upon the testimony of three wit-

nesses who claimed to have seen him at the scene of the crime and that he participated therein. The evidence against the other two defendants is based entirely upon the testimony of Purell, a confessed accomplice. The only circumstantial evidence that we now call to mind that was introduced against Fernekes was the fact that he had two large pistols on his person, and the accompaniments for those weapons, at the time he was arrested. These exhibits furnished no evidence of Fernekes' guilt of the crime charged in this case. The deceased was killed with a 38-calibre bullet, while the pistols of Fernekes were 45-calibre. There was no proof in the record that any such guns were seen or exhibited at the perpetration of the crime. This instruction should therefore not have been given.

The trial court expressed grave doubts as to Fernekes' participation in the crime, and in order to determine the credibility of Fernekes' alibi witnesses sent an investigator to the State of Indiana. The report of the investigator, as already shown, materially strengthened Fernekes' defense. Nevertheless, the report of the investigator, for some unknown and unexplained reason, did not have the effect of satisfying the court that there were still grave doubts as to Fernekes' guilt. These outside investigations were of matters improper to be considered by the court. The court's investigation into the question whether or not there were some members of the detective bureau who had entertained the belief that Fernekes had received a "bum rap" on his conviction in this case was also improper. The motion for a new trial should have been decided solely on its merits after considering the reasons assigned for granting it, and for the reasons aforesaid we hold that the court erred in denying that motion.

It was grievous error for the court to neglect and refuse to discipline the prosecutor and to compel him to give the defendants' witnesses and their counsel decent consideration and the defendants a fair trial in accordance with the es-

tablished rules of law. The court seemed to be impressed with the idea that a rumored criminal record of Fernekes furnished sufficient ground for the prosecutor's resorting to any means to obtain a verdict fixing the death penalty, and that the misconduct of the prosecutor, which the court should have prevented, was commendable. The court, just before pronouncing sentence against the defendants, said: "I am impressed with the fact that whatever shadowy doubt I may have in reference to whether Fernekes was there or not, I haven't any doubt about the proposition that Fernekes is a man—perhaps the most depraved outlaw in this whole community; the most dangerous outlaw in this community; that his hand is against everybody—to take his life or anything else that chances to meet with his fancy; and when a man sets his face against society as a whole, you cannot arouse very much enthusiasm for him." That statement, so far as this record shows, was based entirely upon rumor and newspaper accounts appearing before and at the time of his arrest.

There is no proof in the record that other crimes were committed by Fernekes, and such fact could not properly be shown before the jury. If it is a fact that Fernekes committed other crimes and that he has a criminal record, that does not justify the prosecutor and the court in denying to him a fair and impartial trial according to the law of the land. It is the court's duty, as well as the prosecutor's duty, to see to it that every defendant has a fair and impartial trial, and where they have not done so, and prejudicial and reversible error is willfully committed and willfully allowed, they must accept the responsibility of the reversal of the judgment and sentence so obtained. This record discloses that the defendants have not had a fair and impartial trial.

For the errors aforesaid the judgment of the criminal court is reversed and the cause is remanded.

*Reversed and remanded.*