PEOPLE *v.* LoPRESTO.

1. CRIMINAL LAW—NEW TRIAL—NEWLY DISCOVERED EVIDENCE.

Newly discovered evidence may be the basis for granting a new trial in a prosecution for crime if it is shown that the evidence, and not merely its materiality, be newly discovered; that the evidence be not merely cumulative; that the moving party could not with reasonable diligence have produced the evidence at trial; and that it be such as to render probable a different result on retrial.

2. SAME—NEW TRIAL—NEWLY DISCOVERED EVIDENCE.

Newly discovered evidence that a prosecution witness testified that he had one conviction for drunk driving when actually he had two other convictions of assault, that he made a post-trial affidavit which was diametrically opposed to his trial testimony of who were the original aggressors in an affray during a labor dispute, that another witness testified falsely regarding his age, education, employment record, and weapons-carrying practices, conveying the impression he had attended high school, had a stable employment record, and never carried weapons, when in fact all this was false, that an eyewitness was not indorsed as a *res gestae* witness, and that 3 persons gave a posttrial affidavit tending to show that the first physical assault with force sufficient to kill or inflict great bodily harm was not made by defendant, *held,* sufficient to warrant the granting of a new trial.

3. JUDGES—PRIVATE INVESTIGATION—DISCRETION OF COURT—NEW TRIAL.

Trial judge exceeded his discretionary power in conducting a private investigation which influenced his determination to deny a new trial in prosecution arising from an affray in a labor dispute.

REFERENCES FOR POINTS IN HEADNOTES

[1] 39 Am Jur, New Trial §§ 156–159, 164.
[2] 39 Am Jur, New Trial §§ 156, 164, 166–176.
[3] 39 Am Jur, New Trial §§ 201, 202.

Appeal from Hillsdale; McIntyre (Robert W.), J. Submitted Division 2 June 7, 1967, at Lansing. (Docket No. 1,410.)   Decided December 8, 1967.

Angelo LoPresto was convicted of felonious assault. Defendant appeals. Reversed and remanded.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, and *Harvey W. Moes,* Special Prosecuting Attorney, for the people.

*Zwerdling, Miller, Klimist & Maurer,* for defendant.

BAUM, J. Defendant was charged with assault with intent to murder[1] and was convicted by a jury of felonious assault.[2] He moved for a new trial on the ground of newly discovered evidence. He claims that the trial judge erred in denying this motion and submits seven other assignments of error. Since we conclude that newly discovered evidence warrants a new trial, it will not be necessary to consider the other assignments of error.

There is a lively controversy over the facts in this case. We shall try to separate those which are in dispute from those which are not.

It is clear that Lewis Scott suffered a gunshot wound of the leg in a three-cornered affray. One group of participants in the affray consisted of Scott, Duane Butler, and Edward Earl Brantley. These three men were employed by a private police company which was furnishing services to the strikebound Hillsdale plant of Essex Wire Company. At the time of the altercation, the three plant guards were in an auto attempting to escort another vehicle which was carrying two temporary workers.

---

[1] CL 1948, § 750.83 (Stat Ann 1962 Rev § 28.278).
[2] CL 1948, § 750.82 (Stat Ann 1962 Rev § 28.277).

The second group participating in the affray consisted of Bertus Stemen and Robert Hawley. Stemen was the driver and Hawley a passenger in a small jeep-like truck which was in a procession of a dozen or so cars. The entire auto caravan was harassing the plant guards in the latter's effort to escort and protect the two temporary workers. The defendant offers the following explanation for the harassment. The temporary workers were believed by strike sympathizers to be imported "scabs" who had committed an unprovoked knife attack upon a local citizen. Joseph LoPresto, the defendant's brother, had tried to have the temporary workers arrested, but local authorities refused to do so without a warrant. The strike sympathizers were upset over this and the harassment ensued.

The third group of participants in the affray consisted of the defendant, Angelo LoPresto; his brother, Joseph; and Joseph's 15-year-old son, Tony.

Which of these three groups was the original aggressor was disputed in the evidence and was one of the critical questions before the jury.

The defendant denied firing the shot which injured Scott. The gist of the testimony given by the defendant, Angelo LoPresto, and his brother, Joseph, was that Joseph LoPresto fired the shot in legitimate defense of Angelo and young Tony to protect them from grave danger. On the other hand, testimony from certain of the people's witnesses supported the theory that the defendant fired the shot in question.

The melee started with an exchange of violence between the plant guards on one side and Stemen and Hawley on the other. It was hotly disputed at the trial, however, which of the two groups was the aggressor. There was also a dispute in the testimony concerning which of the five men in this initial altercation was the first to use potentially deadly force.

There appears to be no dispute that the LoPrestos went to the aid of Stemen and Hawley. There is a dispute in the evidence, however, whether this amounted to the LoPrestos' joining in the aggression of their friends, or was in fact the legitimate use of defensive force to protect their companions.

Concerning events which followed the LoPrestos' entry into the affray, there was a controversy as to whether persons in the LoPresto group or in the plant guard group were the first to employ force which appeared to be capable of killing or inflicting great bodily harm.

There was evidence to support the view that the purpose of the shooting was to protect the life of young Tony. On the other hand, there was evidence to support the view that the shooting was with malice aforethought—a product of hatred and racial bigotry. Whether the shooting represented defensive or aggressive force was the principal question for the jury.

The court instructed the jury on self-defense, defense of relatives and defense of companions. Under these instructions, the jury must have found that the LoPresto group were aggressors or were seriously at fault in the melee.

We turn now to the defendant's claim that newly discovered evidence warrants a new trial. The defendant relies on five separate items of evidence. First, the defendant discovered that Duane Butler, one of the plant guards, lied in answering the question, whether he had ever been arrested or convicted of any crime. Butler answered, "I was convicted of a drunk driving charge *once,* sir." (Emphasis added.) The full context of Butler's testimony on cross-examination makes it clear that he conveyed to the jury the impression that this was his only conviction. The newly found evidence shows that in addition to the drunk driving conviction, Butler had,

to his knowledge, twice been arrested and convicted of assault. There is also newly discovered evidence of a third assaultive offense by Butler, but apparently he had not yet been arrested for it at the time of trial.

The second item of the defendant's allegedly newly discovered evidence consists of an affidavit from Butler. On the question of who committed the first serious violence, Butler's affidavit is diametrically opposed to his trial testimony. He testified at trial that Stemen and Hawley were the initial aggressors, aided and abetted by the three LoPrestos. The tenor of Butler's posttrial affidavit is to make Brantley the aggressor in the sense of being the first to resort to physical force sufficient to engender a reasonable and honest belief that it was capable of inflicting serious bodily harm.

The third portion of the allegedly newly discovered evidence consists of information concerning the background of Edward Earl Brantley. The new evidence indicates that Brantley had testified falsely respecting his age, his educational background, his employment record and his weapons-carrying practices. Brantley was one of three plant guards who participated in the physical encounter. There is no question that he exchanged physical force with Stemen and Hawley. The evidence is conflicting as to whether he knifed Stemen. Brantley's trial testimony flatly, clearly, and unreservedly made Stemen and Hawley the aggressors and the LoPrestos, aiders and abettors in such aggression. By his testimony, Brantley and his fellow plant guards were without fault in the melee.

At trial Brantley testified that he attended a Detroit high school and was active in extracurricular activities. The newly discovered evidence shows that he never attended high school; that when he was in the seventh grade he was assigned to an

ungraded class in the Moore school for boys; that
his formal education ended less than two years later
when he left the Moore school; that his testimony
regarding extracurricular activities was a complete
fabrication.

His testimony at trial established a stable and
good work record in desirable employment. The
newly discovered evidence, on the other hand, shows
an unsatisfactory work record. It was revealed after
trial, contrary to his testimony, that Brantley had
never worked for the Detroit department of parks
and recreation; that he hardly had a week's work, all
told, for Star Florists, contrary to his testimony of
long enduring employment; that he worked for
Singleton Private Police for less than two months
rather than the nine months to which he testified;
and that he was fired by two different employers,
Ford Motor Company and Singleton Private Police,
for work-related misconduct which was in direct
conflict with his testimony at trial.

At trial, he testified that he never carried weapons.
The newly discovered evidence demonstrates other-
wise.

The fourth item of allegedly newly found evidence
is the statement of one Joe Cisneros. Cisneros was
not indorsed as a *res gestae* witness, although he
was at the scene of the shooting. His statement
reveals that he did not observe the aggressive con-
duct on the part of Stemen, Hawley and the Lo-
Prestos which was described by prosecution wit-
nesses. His statement also indicates that he did not
observe one Merle Gratz at the scene. Gratz was
a key prosecution witness at the trial. At that time,
the defendant was unaware of the existence of Cis-
neros and had no idea of Cisneros' knowledge of *res
gestae* facts.

The last item of newly discovered evidence con-
sists of an affidavit subscribed by William Benson,

Dannie Byard, and John Miller. They were not indorsed on the information. Their affidavit tends to show that Brantley was armed with a knife; that he probably cut Stemen; that he had earlier threatened "to get" the LoPrestos in profane language and in a provocative manner; that in doing so, Brantley brandished a switchblade or hunting knife from his car window; that Lewis Scott, shortly before the shooting, drove the plant guard's car at a high rate of speed at the LoPresto station wagon almost striking the LoPresto car. These affiants did not see the shooting itself, but saw events so close in time that they lend credence to the defendant's claim that the plant guards were the aggressors.

The Benson-Byard-Miller affidavit has the tendency of showing that the first physical assault with force sufficient to kill or inflict great bodily harm was an assault by motor vehicle, driven by plant guard Scott upon the auto occupied by the LoPrestos.

We turn now to the question of whether the trial judge erred in denying the defendant's motion for a new trial. Tests for measuring the sufficiency of newly discovered evidence were recently stated in the cases of *People* v. *Clark* (1961), 363 Mich 643, and *People* v. *Ake* (1961), 362 Mich 134. These cases hold that for a new trial four requirements must be met. First, the substance of the evidence, and not merely its materiality, must have been discovered after the trial. Second, it must be shown that the new evidence is not merely cumulative. Third, it must be shown that the moving party could not with reasonable diligence have produced the evidence in question at trial. Fourth, the newly discovered evidence must be such as to render probable a different result on retrial.

All of the evidence upon which the defendant relies meets the first test of newness in discovery. At

the time of the trial, defendant and his lawyer were not aware of any of the five items of evidence.

With respect to the issue of the cumulative nature of the evidence, the following observations appear to be in order. The newly found evidence which tends to discredit the testimony of Butler and the testimony of Brantley is not merely cumulative. Indeed, this newly discovered evidence of Butler's criminal record and Brantley's school and work record and weapons-carrying habits does not resemble any of the evidence presented in the trial of the case.

Butler's posttrial affidavit is unusual and noteworthy in that it consists of evidence from an eyewitness who was, at the time of the shooting and at the time of the trial, highly antagonistic to the defendant. The affidavit is unlike any other evidence in the case in that it presents corroboration of defendant's witnesses by a witness in the "enemy camp." Such unique evidence regarding the first use of dangerous force cannot be characterized as merely cumulative.

The factual information, newly discovered from Cisneros, is not merely cumulative. Cisneros is the only disinterested *res gestae* witness whose testimony tends to support the defendant's version of the facts. There is no other evidence like it in the case.

While there is a closer question respecting the cumulative nature of the affidavit executed by Benson, Byard, and Miller, on balance their affidavit would not appear to be merely cumulative. It deals with an incident which occurred shortly before the shooting and one which is not testified to in any considerable detail by other witnesses in the case.

Turning then to the third requirement, is the new evidence such that the moving party could not with reasonable diligence have discovered it before trial?

Prior to trial, the defendant's lawyer was unable to get information concerning Butler's criminal rec-

ord because he did not have correct information concerning Butler's residence, places of employment, and birth date. The prosecutor had, in the best of faith, given defense counsel an incorrect address as Butler's residence. This, rather than any want of diligence, interfered with and quite probably defeated pretrial efforts by the defendant to obtain Butler's arrest record.[3]

With respect to Brantley's background, the exercise of reasonable diligence does not require an exhaustive pretrial investigation into the school, work and birth records of all prosecution witnesses or an investigation into their weapons-carrying propensities. This could be a very costly and time-consuming chore. It would be unfair to impose it upon defendants. The people have some obligation to instruct witnesses to give honest testimony. Defendants need not anticipate that witnesses will lie about such background information as school, work, and birth records.

Cisneros was not indorsed on the information as a res gestae witness, although he should have been since he was present at the time and place of the shooting. At the time of trial, the defendant and his attorney had no idea that Cisneros had been at the scene. His existence was not revealed by thorough investigative efforts. The fact that Cisneros was at the scene was revealed quite by happenstance when Benson, Byard, and Miller came forward with this information after the trial. The defendant's failure to find Cisneros and plumb his knowledge cannot be attributed to any lack of diligence.

Much the same can be said respecting Benson, Byard, and Miller. As in the case of Cisneros, the people did not indorse Benson, Byard or Miller on the information. It is not claimed that they should

[3] For a similar situation and result see United States v. Gordon (DC, 1965), 246 F Supp 522.

have been so indorsed since they did not observe the shooting itself. Nonindorsement is relevant only to show that the criminal information neither indicated the existence of Benson, Byard, and Miller nor suggested that they had any material knowledge.

It would appear that the existence of Benson, Byard, and Miller and their knowledge of events was not revealed by a reasonable investigation prior to trial. Benson, Byard and Miller came forward voluntarily, only after the trial was over.

Nor can a failure to obtain, prior to trial, the information contained in Butler's affidavit be attributed to lack of diligence. It is to be noted that the defendant took the extraordinary steps of retaining a reputable private investigative agency and of seeking pretrial discovery in a criminal case. The defendant's motions for discovery were frustrated by a ruling of the trial court which is not here in question, and the prosecutor contributed to the defendant's difficulties by innocently giving defense counsel an incorrect address for Butler.

We conclude that despite unusual diligence on the part of the defendant the newly discovered evidence was not turned up prior to trial.

We turn to the remaining test: the probability that the newly discovered evidence would bring about a different result upon retrial.

Butler was an important witness at trial. His testimony occupies some 23 pages of the trial transcript. He purported to have observed, and he described from the witness stand, many critical occurrences. Butler's trial testimony tended to show that the LoPrestos, allied with Stemen and Hawley, were the aggressors in the affray.

In a hotly disputed case in which it was important to know which of the three groups was the first to resort to physical violence, the credibility of witness

Butler was of great importance. By his deliberately false testimony concerning his criminal record he deprived the jury of information which they could legitimately use in judging his credibility. A different appraisal of his worthiness of belief might well lead to a different result in a new trial. *United States* v. *Gordon* (DC, 1965), 246 F Supp 522; *United States* v. *Senft* (ED NY 1921), 274 F 629. Without a new trial, the verdict would be forever beclouded by the possibility that the jury unwittingly acted upon false testimony of an undisclosed perjurer and convict.

Brantley was on the witness stand longer than any other witness for the prosecution. His testimony occupies 46 pages of the trial transcript. His testimony was extremely important. He purported to have seen, and he described from the witness stand many of the important events of the affray. The newly discovered evidence, concerning his school and work record, and weapons-carrying practices, strongly discredits his testimony. We note that the sources of the newly discovered evidence would appear to be reliable. They are the records of the Detroit school system; the records of the Detroit department of parks and recreation; Ford Motor Company personnel records and the records of other of Brantley's former employers. Fresh evidence of this sort, particularly when combined with the new evidence contained in Butler's affidavit, might well create doubt in the jury's mind whether the defendant was in fact an aggressor.

Butler's affidavit presents evidence that the first serious violence, capable of killing or maiming came from Brantley. Butler's posttrial affidavit attributes to Brantley a dangerous escalation of force. It tends to blame Brantley for responding to a mere annoyance with potentially deadly violence. It tends to support the claim that the force used by the Lo-

Prestos was justified. While there is some question as to the reliability of Butler's affidavit, we are not prepared to reject it as wholly unreliable. It is, after all, reinforced by the Benson-Byard-Miller affidavit and by Cisneros' memory of the event. Such new evidence might well affect the result on a re-trial.

Cisneros worked as a newspaper reporter at the time of the affray. He is apparently a disinterested witness and an experienced observer. His knowledge of the events is quite inconsistent with the account rendered at the trial by the only other apparently neutral witness, Merle Gratz.

Indeed, it creates some doubt as to whether Gratz was present and in a position to observe the events which he related, so unhestitatingly, from the witness stand. Cisneros' knowledge of the event is in such sharp contrast with the testimony of Gratz that it tends to cast doubt upon and neutralize Gratz's strongly incriminatory testimony. Cisneros' testimony has a tendency to create reasonable doubt as to whether the first violent physical aggression came from Stemen and Hawley or any of the Lo-Prestos. In a case where a reasonable doubt as to a material element of a crime brings acquittal, the testimony of Cisneros could be pivotal.

The Benson-Byard-Miller affidavit, standing alone, is not as strong as the other freshly found evidence. Coming as it does from strike sympathizers who apparently participated in the caravan which harassed the plant guards, the reliability of the Benson-Byard-Miller affidavit is certainly open to doubt. The affidavit, however, is corroborated by an affidavit of William and Jane E. Jack, which was offered in connection with the defendant's motion for a new trial. The Jack affidavit, like the Benson-Byard-Miller affidavit, tends to show that the first serious assault was made by the guards' auto upon

the auto in which the defendant, his brother, and his nephew were passengers.

When a person is shot in a riotous affray such as this one, criminal liability depends heavily upon whether the person doing the shooting was the aggressor. Assuming that the jury followed the court's instructions, the jury must have found that the Lo-Prestos were aggressors or were seriously at fault in the affray. The five items of newly discovered evidence tend to show otherwise. While we cannot say with certainty that on retrial the new evidence would bring an acquittal, we believe that such an acquittal is a distinct probability.

We come now to another reason why the decision denying a new trial must be reversed. Incidentally, this reason affords a possible explanation for the difference between our conclusions concerning the quality of the new evidence and those of the learned trial judge. This case took two weeks to try. The recorded remarks of both lawyers show that the trial was conducted with scrupulous fairness by an able judge. Unfortunately, his conclusions on the motion for a new trial seem to rest, at least in part, on the judge's private investigation. In ruling on this motion he said, *inter alia,*

"I have given very careful consideration to the arguments and briefs presented in support of your motion for a new trial; and I have even gone afield and did some investigating on my own, considering some of the witnesses whose names have been mentioned and the court is not convinced that the testimony of these witnesses would necessarily have changed the verdict of the jury."

Undoubtedly the judge sought information off the record in the best of faith and out of a conscientious desire to find the truth. However, this would not keep his investigation from being an abuse of dis-

cretion. Such a private investigation by a court in a criminal case (except in connection with imposing or relieving a sentence) has been held to thwart the defendant's right to due process of law. In *People v. Cooper* (1947), 398 Ill 468, 477 (75 NE2d 885, 886), a criminal case, it was held that:

"any private investigation by a court pending a motion for a new trial constitutes a denial to the defendant of * * * due process of law."

In *People* v. *Wallenberg* (1962), 24 Ill 2d 350, 354 (181 NE2d 143, 145), the Illinois supreme court held that

"A determination made by the * * * judge based upon a private investigation * * * or * * * private knowledge * * * constitutes a denial of due process."

If the judge can be swayed against a defendant in a criminal case by information obtained outside the courtroom, the defendant and his lawyer have no opportunity to know what this information is, and no chance to test, meet, explain, or overcome it.

Where a judge's private investigation results in a decision convicting or upholding the conviction of a defendant, "Courts have invariably held it to be reversible error [if] it may have partially influenced decision or judgment." *Gordon* v. *United States* (CA 6, 1949), 178 F2d 896, 901.[4]

We need not go so far in this case as to hold that the judge's private investigation deprived the appellant of his constitutional rights. We merely hold that such conduct on the part of the trial judge exceeded his discretionary powers.

---

[4] Accord: *People* v. *McGeoghegan* (1927), 325 Ill 337 (156 NE 378).

For all of the above reasons we conclude that the trial court erred in denying the motion for a new trial.

We need not add that the existence of a strike is not a license to use force. Laws against violence are not suspended during labor disputes. No matter how bitter the strife, violence cannot be tolerated by the community and it makes no difference which side initiates it. The issue in this case is not whether the law will yield a little in view of the ongoing industrial warfare. It will not. The issue in this case is whether the newly discovered evidence warrants a new trial under the standards established by the Michigan Supreme Court for all convicted defendants. We believe it does.[5]

The decision of the trial court denying the defendant's motion for a new trial is reversed and the cause remanded for a new trial.

LESINSKI, C. J., and QUINN, J., concurred.

---

[5] *People v. Ake* and *People v. Clark, supra.*