## GORDON v. UNITED STATES.

### No. 10850.

United States Court of Appeals
Sixth Circuit.

Dec. 5, 1949.

Richard G. Finn, Chicago, Ill. (Donald B. Frederick, Detroit, Mich., John Young Brown, Louisville, Ky., on brief), for appellant.

Vincent Fordell, Detroit, Mich. (Edward T. Kane, Detroit, Mich., Harold D. Beaton, Washington, D. C., on brief), for appellee.

Before SIMONS, ALLEN, and McAL-LISTER, Circuit Judges.

McALLISTER, Circuit Judge.

Meyer Gordon was convicted under an indictment containing two counts, charging him with transporting, or causing to be transported, stolen goods in interstate commerce, and also of conspiring to commit such offense in violation of the National Stolen Property Act.* Specifically, it was claimed that Gordon was a fence for certain jewelry stolen from Walter Ollendorff in the Book-Cadillac Hotel in Detroit. His conviction was affirmed by this court in an opinion in which the details of the crime and of his trial are set forth. Gordon v. United States, 6 Cir., 164 F.2d 855; and certiorari was denied, 333 U.S. 862, 68 S.Ct. 741, 92 L.Ed. 1141. Gordon was sentenced to a twenty-year term in the federal penitentiary and to a fine of $20,-000. He thereafter filed a motion for a new trial on newly discovered evidence on the ground of recantation of testimony given on his trial by the principal government witness. He also filed a motion for vacation of judgment. These motions were denied by the district court; and Gordon appeals from the orders denying the motions.

The principal witness against Gordon was Herman Frank Banning, a co-defendant under the indictment, and, admittedly, one of the criminals engaged in the actual robbery. After Gordon's conviction, Banning, who had pleaded guilty to the same indictment, was released upon his personal bond. While at liberty, Banning engaged in the robbery of two filling stations in Detroit and was apprehended after a gun battle in which he and a Detroit policeman were shot. He pleaded guilty to this crime in the state court and was sentenced to a term of from fifty to sixty years in the Michigan State Penitentiary, where he is now confined.

After his arrest for the filling station robbery, Banning made three affidavits exonerating appellant Gordon of any complicity in the jewel robbery of which he had been convicted. These and certain other affidavits were made the basis of a motion for a new trial by Gordon on the ground of newly discovered evidence, which was denied by the district court. Appellant then filed a motion for vacation of judgment, disqualification of the trial judge and reassignment of the cause to another district judge. This motion was also denied by the district court. Appeal is from denial of all the aforementioned motions.

Prior to the trial of appellant Gordon, Banning had been serving a term of twenty years in a federal penitentiary for the so-called Weiss holdup committed in Detroit, Michigan. Banning was not guilty of this crime. Actually, he was engaged in a robbery at Akron, Ohio, at the very time the Weiss holdup was carried out. He, however, was convicted of the Weiss holdup on the testimony of one McMann who was one of those engaged in that robbery. McMann had confessed, and implicated Banning, to avoid being tried on a murder charge.

Banning, in his affidavits filed in the instant case, says that he felt that he could have the Weiss conviction set aside and secure his freedom if he would implicate appellant Gordon as the "fence" in the Ollendorff robbery, as he knew that the government officials were greatly interested in convicting Gordon. Banning, therefore, after serving five years of his sentence for the Weiss robbery, commenced writing letters from prison to the district attorneys in Chicago and Detroit, suggesting that he would disclose the name of the fence, and also that he had been wrongly convicted of the Weiss holdup, although he was guilty of the Akron robbery. As a result of these disclosures, Gordon was thereafter indicted for the Ollendorff robbery, and, as mentioned, Banning was the principal government witness against him,

---

* Title 18 U.S.C.A. § 413 et seq. [Revised 18 U.S.C.A. §§ 2311, 2314, 2315].

and his testimony largely resulted in Gordon's conviction.

After Gordon's trial, a Presidential pardon for the Weiss robbery (in which, it is admitted, Banning did not participate) was secured by the government officials for Banning. Further, he was released on bond in the Ollendorff case, although he had pleaded guilty as a co-defendant with Gordon. Other similar considerations were given him for his assistance in the Gordon case, and government officials finally secured a job for him in Detroit, where he had been employed up to the time of his robbery of the filling station. In none of these matters, however, did the government officials ever make any offers or inducements to Banning for his testimony.

In his affidavits, which were made a part of Gordon's motion for a new trial, Banning stated that on Gordon's trial, he testified to matters of which he had no personal knowledge for the purpose of obtaining a conviction against Gordon, knowing that unless he so testified, the government would not have sufficient evidence to convict Gordon, and that he was aware that unless Gordon were convicted, Banning himself would not receive any consideration from the government authorities. He further stated that after the theft of the jewelry from Ollendorff in Detroit, it was taken to Chicago and sold by the others who were implicated in the crime; that Banning did not know to whom the jewelry was sold in Chicago; that he did not see appellant Gordon in that city or have any conversation with him relative to the jewelry which had been stolen in Detroit at that time or at any other time; and that the testimony which Banning gave on Gordon's trial relative to what took place after he had registered at the Southmore Hotel in Chicago subsequent to the Detroit robbery was false and given solely for the purpose of convicting Gordon, because of a personal grudge he had against him on account of his association with Banning's wife.

In all of the foregoing, Banning directly contradicted the testimony he had given on the trial. There he testified that on the morning after the robbery, he and the others engaged in the crime arranged to meet Gordon at the Southmore Hotel in Chicago; that Gordon arrived at the hotel and went to Banning's room to inspect the stolen jewelry; that Banning told Gordon that they had stolen the jewelry from the Book-Cadillac Hotel in Detroit; that after some discussion about the price, Gordon agreed to pay $1,000 for the stolen merchandise; that he paid $100 down and agreed to pay the balance of $900 the next day; and that Banning arranged with Gordon to pay Banning's share of $250 to one of the others who had participated in the robbery.

In a second affidavit upon which Gordon's motion for a new trial was also based, Banning stated that although no definite promises had been made to him that he would be freed, the treatment that he received from government officials and his conversations with them satisfied him that he would be discharged from a sentence he was then serving during the pendency of Gordon's trial, and that he would not be sentenced for the robbery to which he had pleaded guilty and in which he had, as he now says, falsely implicated Gordon. Banning declared that the government agents were so determined to get Gordon that Banning was convinced that in return for his testimony, he would be "on the street." Another affidavit in support of the motion for a new trial was executed by Banning's wife, in which she stated that before his testimony implicating Gordon, Banning told her that he was intending to testify falsely against Gordon in order to get out of prison himself. She further deposed that Victor D. Johnson, an agent of the Federal Bureau of Investigation, in a conversation with her and Banning, while the latter was in custody, asked her if she was going to "cooperate" with regard to Gordon; that she replied she knew nothing of Gordon's activities; that the agent then became angry and told her that if she took the witness stand against Banning, they would get her for perjury, but that if she would cooperate, she could stay at the best hotel in De-

troit, visit her husband, would not have to worry about anything in the way of money or expenses, and, if necessary, could have clothes until the case was tried; that her reply was that she would have nothing to do with the matter inasmuch as she knew nothing about the activities of Gordon and had no intention of "cooperating" to send an innocent man to prison. All of these statements with regard to what Agent Johnson told her were categorically denied by him in an affidavit in support of the government's opposition to the motion for a new trial. Johnson did, however, state in his affidavit that in answer to his request to testify in the case, Mrs. Banning said she did not want to be a "stool pigeon" and also that she feared something would happen to her if she took the witness stand; and that "Deponent (Johnson) then advised her that it would not be advisable for her to take the stand and give false testimony to aid the defendant Gordon, because if she did, consideration might be given by Federal authorities to prosecution of her for perjury." Obviously, inferences unfavorable to the government's case could be drawn from this latter statement, so gratuitously volunteered. However, there was no showing on the part of appellant that Mrs. Banning was not available as a witness for Gordon on his trial.

In his affidavits, Banning further stated that, pending the trial of the Gordon case, agent Johnson had bet him a $10.00 hat that if Gordon were convicted, Banning would go free. This was not denied, and this would certainly seem to be an encouragement to Banning that Gordon's conviction would result in his liberation. Moreover, Banning denied on his trial that he had any motives of securing consideration from the government because of his testimony. He was, however, up to the time of the trial holding "privileged" positions as an inner turnkey and an elevator operator at the jail in Detroit. Appellant contends the government officials must have known Banning's disclaimer of motivation was mendacious. But this very point that he was so motivated was strenuously argued to the jury on Gordon's trial.

Banning, then, had been convicted of the Weiss robbery on false testimony. The witness who had given such testimony had received consideration from the authorities by being sentenced for a robbery instead of being tried for a murder. While Banning was serving the sentence for the crime he did not commit, he decided to tell the authorities that Gordon was implicated with him in the Ollendorff robbery; and he certainly did receive advantageous consideration from the government, through obtaining a pardon for the Weiss crime (which he did not commit) and by being allowed to go free on bond after he had pleaded guilty to the Ollendorff robbery, as well as being given help by government officials in securing employment, and in other ways.

In view of the foregoing circumstances, appellant Gordon contends that the district court erred in not granting him a new trial on the ground of newly discovered evidence, based on the recantation made by Banning of his testimony as to Gordon's complicity in the crime.

Banning was a hijacker, burglar, holdup man, and jewel thief. On Gordon's trial, he admitted that he had been guilty of repeated perjury as a witness in other trials. He further told of a score of vicious crimes he had engaged in, and of various prison terms he had served in different parts of the country. The trial judge, in charging the jury in the Gordon case, told them that Banning was admittedly a bad character, that he had served many sentences, and that his testimony should be received with caution and scrutinized very carefully. The court said: "you wouldn't take his testimony as you would the testimony of somebody that came in here that hadn't been in any trouble before. But on the other hand, people who participated in these kind of cases, you and I know that at times they tell the truth. You had before you while he was testifying, his past record, and you know whether to believe Banning or not. I think that the Government's case must rest or fall on Banning, all of it. They have introduced other testimony here that they claim dovetails in, fits in so much that they claim Banning can't help but be tell-

ing the truth. * * * You saw Banning. The witnesses 'faced you. * * * You know whether they have an axe to grind." In spite of his crimes and perjury, the jury believed Banning, and convicted Gordon, on his testimony. Does the fact that he now recants his testimony on the trial as false, require the district court to grant a new trial to Gordon?

The rule to be applied in such cases is outlined in Larrison v. United States, 7 Cir., 24 F.2d 82: A new trial should be granted where the court is reasonably well satisfied that the testimony given by a material witness is false; that, without it, the jury might have reached a different conclusion; that the party seeking the new trial was taken by surprise when the false testimony was given and was unable to meet it or did not know of its falsity until after the trial. This last ground does not seem pertinent to our consideration of the special circumstances of this case, as, certainly, if all of the testimony given against a convicted man were recanted, it would not appear necessary to show that the party seeking a new trial was taken by surprise and was unable to meet such testimony or did not know of its falsity until after the trial.

In the instant case, the first and primary ground, above set forth, for granting a new trial is lacking. The district court was not reasonably well satisfied that the testimony given by Banning on the trial was false. On the contrary, the court believed Banning's statements in his affidavits recanting his testimony on the trial were false. Under the circumstances, this was not an unreasonable conclusion. The duty of the trial court was clear. He was not at liberty to shift upon the shoulders of another jury his own responsibility, but was charged with the responsibility to seek the truth himself. Whether or not a new trial should be granted depended upon all the circumstances of the case. Among the circumstances that were before the trial court at the time of the pendency of the motion for a new trial was the fact that, although Banning had recanted the testi-

mony he had given on the trial that Gordon came to his room in the Chicago hotel to see the jewelry stolen from Ollendorff and that he there purchased it knowing of the robbery, nevertheless, there was a substantial body of testimony in the case that Gordon was the regular fence used by Banning and the gang associated with him; that Gordon had financed Banning when he needed money and had assisted him in the purchase of cars to use in the robberies, and that he had successfully helped him to avoid appearing in another state to answer a criminal charge through arrangements with a physician and the dispatch of a telegram as to Banning's physical condition, although he was actually in good health at the time. None of this testimony was recanted by Banning nor by any of the other witnesses who testified in regard thereto. In view of these circumstances, as well as the fact that the trial court considered that Banning's statements in his affidavits recanting his testimony on the trial were false, we can not say that the order of the district court denying a new trial was error. People v. Shilitano, 218 N.Y. 161, 112 N.E. 733, L.R.A.1916F, 1044.

It is further claimed that the court erred in not granting a motion to vacate the judgment, disqualify the trial judge, and reassign the case to another judge. The ground upon which this contention is based is certain conduct of the trial judge in interviewing a witness and making an ex parte investigation of facts on the motion for a new trial. It appears that the daughter of appellant called upon the trial judge at chambers, after an appointment had been arranged by a mutual friend who told her that if the judge could ascertain that her father were innocent, he would be freed. In the interview, she told the judge that two agents of the F.B.I. had made a report to Washington, and that if the judge could examine the report, he would see that Banning had lied on the trial and that the reports were at variance with the affidavits which the agents had made on the motion for a new trial in the Gordon case. Furthermore, she told the judge that Bernard Sidran, whom Banning had im-

plicated as having been associated with him in the Ollendorff robbery, was then incarcerated in the Ohio State Penitentiary for another crime, and could absolutely prove that he could not have participated in the Ollendorff robbery as he was aboard a steamship on a Great Lakes cruise at the time this robbery took place. The trial judge was impressed with these statements and determined to investigate the matter personally. He went to the state penitentiary and interviewed Sidran, who stated, as the judge had been told by Gordon's daughter, that he and his wife had been on a ship on a lake trip on the Canada Steamship Lines at the time of the Ollendorff holdup on September 13, 1940. The judge then returned to Detroit, called the Federal Bureau of Investigation officials to his chambers, and told them the result of his investigation.

The F.B.I. agents informed the judge that there was on file in the proceedings for a new trial an affidavit made by the Passenger and Ticket Agent for the Canada Steamship Lines, setting forth that Sidran and his wife had been sold tickets for the trip, which commenced August 20, 1940, and ended in Buffalo, August 26, 1940; that the tickets so sold were never redeemed or canceled but were in the possession of the steamship company, having been taken up for the voyage; that Mrs. Sidran had previously called upon the Ticket Agent and had asked to see the tickets, which he had then exhibited to her; and that she then requested him to turn the tickets over to her, which he refused to do. This appeared to dispose of Sidran's statement to the judge, that he could not have been present in Detroit on September 13, 1940, because of his being a passenger on that voyage. With regard to the report to Washington by the agents of the Federal Bureau of Investigation, these agents appeared before the judge and informed him that they had used the reports sent to Washington as a basis for their affidavits, which had been made several months before, and which were then on file in the proceedings for a new trial in the Gordon case; and it appears that it was disclosed in their affidavits that Ban-

ning had recanted the testimony he had given on the trial. The net result of the trial judge's interview with Sidran, and his investigation of the Federal Bureau of Investigation reports, amounted to the disclosure of facts which were included in affidavits that were, at the time, on file in the case on the pending motion for a new trial.

It is contended that the action of the trial judge in conducting, without notice to the parties, the private and extrajudicial investigation in the case constituted such error as vitiated the order denying a new trial.

So fraught with possible injustice and peril to the rights of a party is the conduct of a judge in conducting a private and extrajudicial investigation on a matter pending before him that courts have invariably held it to be reversible error where it may have partially influenced decision or judgment. It is held, in all cases, a judge must not privately seek information as to a fact pending before him for decision. Statements so received are not legitimate evidence. A decision on a motion for a new trial should be based only upon evidence by affidavit, deposition, or upon sworn testimony in open court.

In People v. McGeoghegan, 325 Ill. 337, 156 N.E. 378, 385, a defendant, Fernekes, who produced several alibi witnesses on his trial, had been convicted of murder. On a motion for a new trial, the court made an independent investigation by sending a special deputy bailiff to Indiana to interview several persons so as to determine the credibility of certain alibi witnesses who had testified for defendant. The special investigator reported back to the court that the defendant's witnesses were all in good standing and bore reputations for veracity in the community in which they lived. The trial court, nevertheless, overruled defendant's motion for a new trial. On appeal, the Supreme Court of Illinois reversed the case, and in the course of its opinion, said:

"The trial court expressed grave doubts as to Fernekes' participation in the crime,

and in order to determine the credibility, of Fernekes' alibi witnesses sent an investigator to the state of Indiana. The report of the investigator, as already shown, materially strengthened Fernekes' defense. Nevertheless, the report of the investigator, for some unknown and unexplained reason, did not have the effect of satisfying the court that there were still grave doubts as to Fernekes' guilt. These outside investigations were of matters improper to be considered by the court. The court's investigation into the question whether or not there were some members of the detective bureau who had entertained the belief that Fernekes had received a 'bum rap' on his conviction in this case was also improper. The motion for a new trial should have been decided solely on its merits after considering the reasons assigned for granting it, and for the reasons aforesaid we hold that the court erred in denying that motion."

The above case may be distinguished in some degree from the one before us by the fact that, in the former case, the trial judge may have been unfavorably impressed by the way in which the information was conveyed to him by the bailiff, or may have been influenced by the nature or emphasis of the unsworn communications made to him, even though favorable in a certain aspect to the defendant, to decide against him on his motion for a new trial. In the instant case, the trial judge decided on the affidavits before him.

In all that he did in this case, the trial judge was actuated by the highest motives of justice. He interviewed Sidran solely with the object of finding evidence of Gordon's innocence; and his investigation of the Federal Bureau of Investigation reports was directed to the same purpose. All of the judge's actions were induced by the insistence of appellant's daughter in her quest for help for her father, and everything the judge did in conducting the interview with the witness and the investigation was done on Gordon's behalf. The motive behind the conduct of an extrajudicial inquiry by a judge of a matter of a pending before him, of course, does not make for approval of this kind of investigation. But from everything before us in this case, we can conceive of no disadvantage to Gordon resulting from the action of the trial judge, and we find no reversible error.

The orders of the district court are, accordingly, affirmed.